**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

WSP USA SERVICES INC.,     )
                               )
        Plaintiff,          )
                               )
       v.                      )     C.A. No. 2025-0833-KSJM
                               )
VERSAR, INC.,              )
                               )
       Defendant.        )

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

1.     This case arises over a post-closing dispute between Defendant Versar, Inc. ("Buyer") and Plaintiff WSP USA Services Inc. ("Seller").[1] Buyer acquired facility management company Louis Berger Services, Inc. from Seller pursuant to a Stock Purchase Agreement dated August 4, 2023 (the "Purchase Agreement").[2]

2.     The Purchase Agreement provided Buyer a purchase price adjustment based on net working capital adjustments. The Purchase Agreement sent disputes over net working capital adjustments to a neutral auditor. Section 1.4 of the Purchase Agreement establishes that process. As part of that process, Buyer was required to provide Seller with a closing statement containing Buyer's "good faith determination" of Louis Berger's "Net Working Capital" at the time of closing.[3] The Purchase Agreement defines "Net Working Capital" as Louis Berger's current assets

---

[1] The facts are drawn from the Verified Complaint (the "Complaint") and documents it incorporates by reference. C.A. No. 2025-0833-KSJM, Dkt. 1 (Compl.).

[2] *Id.* ¶¶ 1, 14.

[3] *Id.* ¶ 23; *id.*, Ex. A (Purchase Agreement) § 1.4(b)(i).

less its current liabilities.[4] If Seller had any objections to Buyer's closing statement, the Purchase Agreement required the parties to attempt to resolve their differences for 30 days and then submit the dispute to a "Neutral Auditor"—defined as accounting firm KMPG US LLP or another nationally or regionally recognized accounting firm—to determine the value of disputed items on the closing statement.[5]

3.      The Purchase Agreement required insurance coverage as a remedy for post-closing breach.  Section 7.1 of the Purchase Agreement describes Buyer's right to recourse against its insurers.  Under Section 7.1, the agreement's representations would not survive the closing.[6] Other than in the case of fraud, Buyer's representations-and-warranties insurance policy was the sole remedy for breaches or inaccuracies of representations post-closing.[7]

4.      The parties attached a form of Buyer's representations-and-warranties insurance policy as an exhibit to the Purchase Agreement.  Section 5.4 of the Purchase Agreement required Buyer to obtain a representations-and-warranties insurance policy with the same terms and conditions as the form attached to the agreement.[8]

---

[4] Purchase Agreement § 23.1 (defining "Net Working Capital").

[5] Compl. ¶ 23; Purchase Agreement §§ 1.4(b)(ii)–(iii), 23.1 (defining "Dispute Resolution Procedure" and "Neutral Auditor")

[6] Compl. ¶ 21; Purchase Agreement § 7.1(a).

[7] Compl. ¶ 22; Purchase Agreement § 7.1(a).

[8] Purchase Agreement § 5.4; Dkt. 8 ("Def.'s Opening Br."), Ex. 2 ("R&W Insurance Policy").

5. The policy terms prohibited "double counting." That is, Buyer could not recover funds from its insurer that were taken into account in the calculation of the purchase price adjustment. The policy states that the insurer:

> shall not be liable to make any payment for that portion of Loss to the extent . . . such portion was specifically taken into account dollar for dollar in the calculation of the Purchase Price pursuant to the Purchase Price Adjustment as finally determined under the terms of the Acquisition Agreement, and the Insureds directly or indirectly recovered for such portion of Loss (as determined on a "with and without" such Loss basis, with the intent of this provision to merely be to avoid "double counting" and not to otherwise limit any right to recover for such Loss in excess thereof)[.][9]

Put differently, if Buyer successfully recovers a loss through a purchase price adjustment, Buyer may not attempt to recover for the same loss under its representations-and-warranties insurance policy. Allowing Buyer to do so would result in double counting.[10]

6. When it submitted the closing statement to Seller, Buyer proposed a purchase price adjustment of roughly $9.7 million. Of that amount, Buyer attributed about $5.3 million to contracts with the Florida Department of Transportation (the "Florida Contracts").[11] Buyer claimed that Seller had not fully performed under the Florida Contracts, and Buyer recorded the underperformance of the Florida

---

[9] R&W Insurance Policy § II(C).

[10] *Id.*

[11] Compl. ¶ 30; *id.* Ex. C ¶ 4.

3

Contracts as a current liability when it submitted the closing statement to Seller. In other words, Buyer treated the dispute as one over Net Working Capital.

7.    Seller timely objected, stating that the Florida Contracts issue was not subject to a purchase price adjustment.[12] Because a representation covered the Florida Contracts, Seller argued that Buyer's proper source of recovery was through insurance. The parties did not resolve the issue within 30 days, so on July 17, 2025, Buyer initiated dispute resolution proceedings with KPMG.[13]

8.    The next day, Seller filed this suit, alleging that Buyer breached several provisions of the Purchase Agreement by bringing the Florida Contracts dispute to KPMG. In Count I, Seller seeks a declaratory judgment under 10 *Del. C.* §§ 6501–03 that the Florida Contract dispute is properly a dispute regarding breach of a representation, and not a Net Working Capital dispute subject to a purchase price adjustment.[14] In Count II, Seller brings a breach-of-contract claim, alleging that Buyer breached Sections 1.4 and 7.1 of the Purchase Agreement by treating the Florida Contracts dispute as a Net Working Capital dispute.[15] Seller claims that whether Seller fully performed under the Florida Contracts is covered by Section 3.14 of the Purchase Agreement, in which Seller represented material compliance with all

---

[12] *Id.* Ex. C ¶ 4.

[13] Compl. ¶¶ 41–42.

[14] *Id.* ¶¶ 47–53.

[15] *Id.* ¶¶ 54–62.

government contracts, like the Florida Contracts.[16]  In Count III, Seller seeks an injunction prohibiting Buyer from pursuing any further dispute resolution proceedings with KPMG.[17]

9.      Buyer moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6).[18]  "[T]he governing pleading standard . . . to survive a motion to dismiss is reasonable 'conceivability.'"[19]  When considering a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true, . . . draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[20]  The court, however, need not "accept conclusory allegations

---

[16] *Id.* ¶ 34.  In Section 3.14, Seller represented that other than as set forth in a disclosure schedule attached to the Purchase Agreement, it had "complied in all material respects" with all terms and conditions of government contracts.  Purchase Agreement § 3.14(d); Dkt. 15 ("Pl.'s Answering Br."), Ex. 1 ("Disclosure Schedule"). Seller further represented that there had been no "ongoing[] material delay regarding any material milestone or applicable performance metric with respect" to government contracts.  Compl. ¶ 19; Purchase Agreement § 3.14(i).  Several government contracts are listed in the agreement's disclosure schedule, which carved out performance and compliance issues from the representations in Section 3.14.  *See* Purchase Agreement § 3.14(i); *see generally* Disclosure Schedule.

[17] *Id.* ¶¶ 63–70.

[18] Dkt. 6.

[19] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[20] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[21]

10.     Seller predicates Count I for declaratory relief, and Count III for injunctive relief, on Count II for breach of contract.  This analysis thus turns first to Count II.

11.     To state a claim for breach of contract, a party must demonstrate the existence of a contract, the breach of an obligation imposed by that contract, and harm or damage resulting from the breach.[22]

12.     The court's task is to interpret the Purchase Agreement in a way that carries out the parties' intent.[23]  Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[24]  The contract terms will be given "plain, ordinary meaning."[25]  "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire

---

[21] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[22] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[23] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[24] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[25] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citing *City Investing Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

agreement where such inference runs counter to the agreement's overall scheme or plan."[26] The court must "reconcile all the provisions of the instrument" if possible.[27]

13. Seller does not argue that liabilities associated with the underperformance of the Florida Contracts are not current liabilities within the definition of Net Working Capital.[28] Nor does Seller dispute that disagreements over Net Working Capital are properly submitted to a Neutral Auditor if the parties cannot resolve the dispute within 30 days.[29]

14. Seller instead argues that the terms of the Purchase Agreement prohibit Buyer from treating the Florida Contracts dispute as the basis for a purchase price adjustment under Section 1.4. Seller views Section 7.1's representations-and-warranties insurance policy as Buyer's sole remedy for breach of representations.[30]

15. Seller's view of the Purchase Agreement is not faithful to the agreement's plain language. The Purchase Agreement unambiguously contemplates a scenario in which a post-closing dispute implicates multiple potential paths of recovery and Buyer chooses one—either a purchase price adjustment or recovery under the representations-and-warranties insurance policy.

---

[26] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985); *accord. HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2020 WL 3620220, at *6 & n.40 (Del. Ch. July 2, 2020); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *50 & n.648 (Del. Ch. Dec. 3, 2018).

[27] *Elliott Assocs. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

[28] *See generally* Pl.'s Answering Br.

[29] *Id.*

[30] *See* Compl. ¶ 57.

7

16.    The form insurance policy is incorporated into the Purchase Agreement and the court may properly consider it.[31]  The policy states that to avoid double-counting, any disputes that could warrant recovery under both a purchase price adjustment and the representation-and-warranties insurance policy may only qualify for recovery under one.[32]  By prohibiting double-counting, the policy implies that some losses might give rise to claims under both.  The double-counting provision is only necessary for that reason.

17.    *OSI Systems, Inc. v. Instrumentarium Corp.*,[33] Seller's primary authority, does not help its argument.[34]  In *OSI*, the buyer made an adjustment to a working capital statement for a post-closing purchase price adjustment.  The buyer did so because seller failed to prepare the original working capital statement in compliance with U.S. GAAP.  But the seller had made a representation that it had prepared the original working capital statement in compliance with U.S. GAAP, so

---

[31] On a motion to dismiss, the court can consider documents that the complaint incorporates by reference, such as documents that the complaint quotes or cites.  *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013), *as corrected* (Oct. 8, 2013) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." (quoting *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at *3 n.17 (Del. Ch. Mar. 29, 2011))); *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint; this is true even where the documents are not expressly incorporated into or attached to the complaint.").

[32] R&W Insurance Policy § II(C).

[33] 892 A.2d 1086 (Del. Ch. 2006).

[34] *See* Pl.'s Answering Br. at 33–35.

the seller argued that the issue was properly a representations-and-warranty dispute rather than a dispute over a purchase price adjustment.

18. On a motion for judgment on the pleadings, the court ruled for the seller. He held that the dispute was properly a representations-and-warranties dispute because the seller made a specific representation that the original working capital statement used U.S. GAAP, so "the assertion that the [original statement] did not comply with U.S. GAAP is also necessarily an assertion that [the seller] breached a representation and warranty."[35] The court also noted "the fact that a ruling for [the buyer] would undermine the limitations on liability . . . contained in the Purchase Agreement."[36]

19. But *OSI*'s facts are distinguishable for a few reasons. Foremost, *OSI*'s foundational premise is that "the assertion that the [original statement] did not comply with U.S. GAAP is also *necessarily* an assertion that [the seller] breached a representation and warranty."[37] In other words, it was impossible for the buyer to defend its purchase price adjustment without asserting that the seller breached a representation in the purchase agreement.

20. Here, Seller only represented that Louis Berger had materially complied with all government contracts and that there were no material delays or issues with the performance of those contracts, other than as set forth in a disclosure schedule

---

[35] *OSI*, 892 A.2d at 1092.

[36] *Id.* at 1093–94.

[37] *Id.* at 1092 (emphasis added).

attached to the Purchase Agreement.[38] Neither the Complaint nor Seller's arguments suggest that the alleged underperformance of the Florida Contracts is necessarily coextensive with a breach of any representation.[39] Indeed, Seller maintains that it did not breach any representations.[40] And there are myriad conceivable scenarios in which Seller did not breach any representation and yet there is still some liability under the Florida Contracts that would classify as a current liability under Net Working Capital. The fact that Buyer deems the Florida Contract dispute relevant to a Net Working Capital does not require that Buyer argue that Seller breached a representation.

21. Nor does this case give rise to the concerns in *OSI*, where the buyer sought an "end-run" around limitations on liability in the agreement.[41] Here, other provisions in the Purchase Agreement—the representations-and-warranties insurance policy—contemplate disputes that could properly arise as both purchase price adjustment disputes and representations-and-warranties disputes. There can be no "end-run" here, where pursuing recovery through a purchase price adjustment instead of the representations-and-warranties insurance policy is contemplated in the agreement.

---

[38] Purchase Agreement §§ 3.14(d), (i).

[39] *See generally* Compl.

[40] *Id.* ¶ 20.

[41] *OSI*, 892 A.2d at 1095.

10

22.    Seller's second authority, *Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P.*,[42] weighs in Buyer's favor.[43]  There, on a motion for judgment on the pleadings, the court considered two provisions: a purchase price adjustment provision that stated that it was the "sole and exclusive" remedy for purchase price disputes, and an indemnity provision that stated that it was the "sole and exclusive" remedy of recovery for any claims concerning the transaction.  The parties agreed that the dispute in the case, an "accounting methodology" issue, fell under both provisions.[44]  But the agreement also contained a *proviso* stating that in case of conflict between the two provisions, the purchase price adjustment provision would supersede the indemnity provision.[45]  Based on the hierarchy *proviso*, the court held that the dispute must proceed as a purchase price dispute.

23.    The Purchase Agreement does not contain a hierarchy *proviso*.  The lack of a hierarchy *proviso* suggests that there is no remedy hierarchy.[46]  If there is no remedy hierarchy, and the Purchase Agreement's plain terms contemplate Buyer choosing a purchase price adjustment over the representations-and-warranties insurance policy, it is unreasonable to conclude that Buyer breached the Purchase Agreement by doing exactly that.

---

[42] 2015 WL 1897659 (Del. Ch. Apr. 24, 2015).

[43] *See* Pl.'s Answering Br. at 30.

[44] *Alliant*, 2015 WL 1897659, at *1, *6–7.

[45] *Id.* at *9 ("The trumping provision is found in Proviso (y) in [the indemnity provision] . . . : 'nothing in this sentence shall operate to interfere with or impede the operation of the [purchase price adjustment provisions].'" (emphasis omitted)).

[46] Seller acknowledges this point.  Pl.'s Answering Br. at 30.

24. Finally, Seller argues that dismissal is inappropriate because the parties dispute allegations like how Seller had historically recorded current liabilities and the extent of Louis Berger's underperformance on Florida Contracts.[47] But in resolving this motion, the court does not consider whether Seller breached any representations in the Purchase Agreement. Rather, the court must determine whether Buyer breached the agreement by bringing the Florida Contracts dispute to KPMG as a purchase price adjustment. Because the Purchase Agreement allow Buyer to pursue a purchase price adjustment, Seller's allegations as to Count II fail as a matter of law.

25. Count II for breach of the Purchase Agreement is dismissed because Buyer did not breach the agreement by treating the Florida Contract dispute as a purchase price adjustment. Because Seller predicates Count I for declaratory and Count III for injunctive relief on Count II for breach of contract, neither Count I nor Count III state a claim. Counts I and III are dismissed.

26. Buyer's motion is GRANTED.

/s/ *Kathaleen St. J. McCormick*
Chancellor Kathaleen St. J. McCormick
Dated: July 2, 2026

---

[47] Pl.'s Answering Br. at 26.

12